# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| DIANNA CHASE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 4:23-cv-903 |
| | ) | |
| CITY OF EXCELSIOR SPRINGS; | ) | |
| EXCELSIOR SPRINGS POLICE CHIEF | ) | |
| GREGORY DULL; SERGEANT BRET | ) | |
| RIDER; CORPORAL SCOTT SICKLES; | ) | |
| OFFICER PAYDEN THORNTON; | ) | |
| COMMUNICATIONS OFFICER JAE | ) | |
| JUAREZ; EXCELSIOR SPRINGS FIRE | ) | |
| CHIEF JOSEPH MADDICK; JOHN DOE | ) | |
| EMS OFFICERS 1 AND 2; FORENSIC | ) | |
| MEDICAL OF KANSAS, LLC; | ) | |
| FRONTIER FORENSICS MIDWEST, | ) | |
| LLC; CLAY COUNTY, MISSOURI; | ) | |
| CLAY COUNTY SHERIFF WILL AKIN; | ) | |
| SERGEANT CHRIS JOHNSON; | ) | |
| DETECTIVE BRUCE TRAXLER; | ) | |
| DETECTIVE VINCE PERNICE; | ) | |
| DETECTIVE KATT FORD; DETECTIVE | ) | |
| BRANDON KAHLER; and AXON | ) | |
| ENTERPRISE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT WITH JURY DEMAND

COMES NOW, Plaintiff, Dianna Chase, and for her causes of action against the

Defendants named herein, states as follows:

## STATEMENT OF THE CASE

1.      This is an action pursuant to 42 U.S.C. § 1983 to seek redress of the unlawful

deprivation of Benjamin ("Benjamin") Eli Chase's right to life, inherent in his humanity,

fundamental to the United States Constitution, and expressly incorporated into the Due Process

1

Clause of the Fourteenth Amendment thereto. Benjamin died on May 8, 2022 at the age of 21 in the custody of the Excelsior Springs Police Department after unnecessary and excessive use of a TASER deployed by a police officer without justification and subsequent negligence that occurred while Benjamin was in police custody, all of which resulted in the suffering and wrongful death of Plaintiff's son, Benjamin.

2. Plaintiff alleges claims against certain Defendants pursuant to 42 U.S.C. § 1983 for deprivations of Benjamin's rights under the Fourth, Eighth and Fourteenth Amendments to the U.S. Constitution.

3. Plaintiff alleges claims against certain Defendants pursuant to Missouri's wrongful death statute, R.S.Mo. § 537.080, with certain underlying and related common law claims.

4. Plaintiff alleges additional common law claims against certain Defendants.

5. Plaintiff alleges products liability and failure to warn claims relating to TASERs against TASER manufacturer Defendant Axon.

## JURISDICTION & VENUE

6. This Court has subject matter jurisdiction over the federal claims under 28 U.S.C. § 1331 and jurisdiction over civil rights claims under 28 U.S.C. § 1343(3) and (4).

7. This Court has jurisdiction over the products liability claims against Defendant Axon Enterprise, Inc. under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and Plaintiff and Axon Enterprise, Inc. are citizens of different states.

8. This Court has jurisdiction over the request for declaratory relief in Count XV pursuant to the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202.

9. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because they are so related to the federal claims that they form part of the same case or controversy.

10. Venue is appropriate in the Western District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because the acts alleged in this Complaint occurred within this judicial district in Excelsior Springs, Missouri.

## THE PARTIES & THE DECEDENT

11. Plaintiff Dianna Chase ("Plaintiff" or "Ms. Chase") is an adult competent to bring suit. She is a citizen of Missouri and resident of Plattsburg in Clinton County, in the State of Missouri. She is the adoptive mother of Benjamin, his next of kin, and his heir.

12. Plaintiff is the proper party to file this action for the wrongful death of her son and is a Class One beneficiary, pursuant to R.S.Mo. § 537.080(1).

13. No other action is pending for the wrongful death of Benjamin Chase.

14. Benjamin was born on October 5, 2000 and was 21 years old at the time of his death. Benjamin was African-American. Benjamin was adopted by Ms. Chase at approximately 3 years old. On information and belief, Benjamin had Autism Spectrum Disorder, Bipolar Disorder, Attention-Deficit Hyperactivity Disorder, Borderline Intellectual Functioning, and PTSD.

15. Plaintiff sues each and all defendants in both their individual and official capacities.

16. Defendant City of Excelsior Springs ("City") is a municipality of the State of Missouri and operates two departments relevant here: the Excelsior Springs Police Department

("Excelsior Springs PD") and the Excelsior Springs Fire Department, which provides the City's Emergency Medical Service ("Fire Department" or "Excelsior Springs EMS").

17.    Upon information and belief, the City carries liability insurance with coverage inclusive of the types of claims alleged herein.

18.    Defendant Gregory Dull is the Chief of Police for Excelsior Springs PD and has served in that role at all times relevant and the acts and/or omissions described herein were done in both his individual capacity and in his official capacity as an employee of Excelsior Springs PD.

19.    Defendant Joe Maddick is the Fire Chief for Fire Department and has served in that role at all times relevant and the acts and/or omissions described herein were done in both his individual capacity and in his official capacity as an employee of Fire Department.

20.    Defendants John Doe EMS Officers 1 and 2 are emergency medical technicians and employees of the Fire Department and the acts and/or omissions described herein were done in both their individual capacity and in their official capacity as employees of Fire Department.

21.    Defendant Sergeant Bret Rider ("Defendant Rider") is a police officer and employee of Excelsior Springs PD and the acts and/or omissions described herein were done in both his individual capacity and in his official capacity as an employee of Excelsior Springs PD.

22.    Defendant Corporal Scott Sickles ("Defendant Sickles") is a police officer and employee of Excelsior Springs PD and the acts and/or omissions described herein were done in both his individual capacity and in his official capacity as an employee of Excelsior Springs PD.

23.    Defendant Officer Payden Thornton ("Defendant Thornton") is a police officer and employee of Excelsior Springs PD and the acts and/or omissions described herein were done

in both his individual capacity and in his official capacity as an employee of Excelsior Springs PD.

24.     Defendant Communications Officer Juarez ("Defendant Juarez") is a police officer and employee of Excelsior Springs PD and the acts and/or omissions described herein were done in both her individual capacity and in her official capacity as an employee of Excelsior Springs PD.

25.     Defendant Clay County, Missouri ("Defendant Clay County") is a public entity of the State of Missouri which operates the Clay County Sheriff's Department.

26.     Upon information and belief, Defendant Clay County carries liability insurance with coverage inclusive of the types of claims alleged herein.

27.     Defendant Will Akin is the Clay County Sheriff and has served at all times relevant and the acts and/or omissions described herein were done in both his individual capacity and in his official capacity as an employee of Clay County.

28.     Defendant Sergeant Chris Johnson is an employee of Defendant Clay County which lead the investigation of Benjamin's death and the acts and/or omissions described herein were done in both his individual capacity and in his official capacity as an employee of Clay County Sheriff's Office.

29.     Defendant Detective Bruce Traxler is an employee of Defendant Clay County which assisted in the investigation of Benjamin's death and the acts and/or omissions described herein were done in both his individual capacity and in his official capacity as an employee of Defendant Clay County.

30.     Defendant Detective Vince Pernice is an employee of the Liberty, Missouri Police Department which assisted in the investigation of Benjamin's death and the acts and/or

omissions described herein were done in both his individual capacity and in his official capacity as an employee of Liberty Police Department.

31.     Defendant Detective Katt Ford is an employee of the Smithville, Missouri Police Department which assisted in the investigation of Benjamin's death and the acts and/or omissions described herein were done in both his individual capacity and in his official capacity as an employee of Smithville Police Department.

32.     Defendant Detective Brandon Kahler is an employee of the North Kansas City, Missouri Police Department which assisted in the investigation of Benjamin's death and the acts and/or omissions described herein were done in both his individual capacity and in his official capacity as an employee of North Kansas City Police Department.

33.     Upon information and belief, Defendant Forensic Medical of Kansas, LLC ("Defendant Forensic Medical") is the Medical Examiner for, and an agent of, Defendant Clay County and the acts and/or omissions described herein were done both in its individual capacity and in its official capacity as an agent of Defendant Clay County.

34.     In the alternative, upon information and belief, Defendant Frontier Forensics Midwest, LLC (now known as Bassett Hound Enterprises LLC) ("Defendant Frontier Forensics") is one and the same as, or does business as, or is the parent and/or subsidiary of Defendant Forensic Medical of Kansas, LLC.

35.     Upon information and belief, Defendants Forensic Medical and Frontier Forensics operate at the same addresses at 2000 Merriam Lane, Kansas City, Kansas and at 40 S. 18th Street, Kansas City, Kansas. Both use the same phone numbers, have the same employees and operate the same type of business.

36.     Upon information and belief, Defendant Axon Enterprise, Inc. ("Axon"), formerly known as Taser International, Inc. until in or about April 2017, manufactured the TASER used by Defendant Rider against Benjamin.

**GENERAL ALLEGATIONS**

37.     As of the July 2022 census, Excelsior Springs is 87.7% white and only approximately 5% of the population is Black.

38.     Benjamin was a young, Black man of mixed race with multiple mental health disorders, include Autism Spectrum Disorder, Bipolar Disorder, ADHD and Borderline Intellectional Functioning.

39.     Before his detention and death, Benjamin expressed frustration to his health mental health case worker at the racial animus he felt directed toward him as a person of color in Excelsior Springs.

40.     Benjamin had been targeted by Excelsior Springs PD officers, including Defendants Rider and Sickles in the past.

41.     Defendant Rider and Defendant Sickles were both familiar with Benjamin from past interactions, and Plaintiff had explained to Defendants Rider and Sickles during certain such interactions of Benjamin's mental health disorders.

**ALLEGATIONS RELATING TO THE ARREST & TASER USE**

42.     Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

43.     At approximately 7:37 p.m. on May 7, 2022, Defendant Rider was dispatched to The Elms Hotel, where Benjamin was legally strolling the property while black.

44.     According to police records, the Excelsior Springs PD was called because Benjamin was "walking around in the employee parking lot and talking to people." There was no

report that Benjamin was engaged in any criminal activity. There was no report that Benjamin was behaving in a threatening manner. There was no report that Benjamin was armed.

45.     In fact, Benjamin was unarmed and lightly dressed in a t-shirt, jeans and tennis shoes, and only had a cell phone and phone charger on his person.

46.     Upon Defendant Rider's arrival, he reports to have "immediately recognized" Benjamin.

47.     Defendant Rider has had past interactions with Benjamin and his mother, the Plaintiff, and Plaintiff has advised Defendant Rider in the past of Benjamin's mental health disorders.

48.     Defendant Rider claims to have made verbal commands for Benjamin to turn around and put his hands behind his back, at which time Defendant Rider claims Benjamin pulled a cell phone out of his pocket and started to run away.

49.     To the contrary, video evidence suggests that upon arrival at The Elms, Defendant Rider immediately began to run at Benjamin in an aggressive and angry manner.

50.     Within a minute, Defendant Rider had chased Benjamin down and tased him without cause. Benjamin was at all relevant times at a safe distance from Defendant Rider and any member of the public and was not behaving in a threatening manner.

51.     Defendant Rider admits that he did not advise Benjamin that he was under arrest prior to chasing and tasing Benjamin in a May 8, 2022 interview by Defendant Clay County Detective Traxler at 1846 hours, or approximately 6:46 p.m. (the "May 8, 2022 Interview").

52.     Defendant Rider had no reason to believe Benjamin was armed or presented a threat to his safety or the safety of others. Yet Defendant Rider proceeded to unholster and engage his TASER, activating its camera while running toward Benjamin at high speed.

53.     At no point in the TASER camera footage does Defendant Rider issue any verbal commands or warnings to Benjamin prior to shooting his TASER.

54.     Defendant Rider falsified his police report, stating that "[a]fter about 75 yards, Chase turned around quickly and started running toward me." Video from Defendant Rider's TASER camera clearly shows this is not true.

55.     In the May 8, 2022 Interview, Defendant Rider describes Benjamin's arms as "flailing" at the time Defendant Rider claims Benjamin turned toward him, indicating no threat toward Defendant Rider's personal safety. Indeed, video from Defendant Rider's TASER camera shows Benjamin's facial expression and body language was a mix of shock, surprise and fear at being chased by an armed officer pointing a weapon at him.

56.     Despite the absence of exigency or threat to himself or the public, Defendant Rider shot Benjamin with his TASER at point-blank range.

57.     Defendant Rider reports that he "pointed [his] taser in the center of Chase's chest."

58.     TASER safety recommendations for reducing cardiac risks are to target the back of the body and avoid targeting the head, neck, chest or groin whenever possible.

59.     TASER safety recommendations reflect that, among other health issues, electrical shock from a TASER can cause a life threatening arrhythmia called ventricular fibrillation, even in physically healthy people with no prior heart conditions. Ventricular fibrillation means the heart's lower chambers (ventricles) beat in an atypical rhythm, reducing the heart's ability to pump enough blood to the body consistently and raising the risk of cardiac arrest.

60.     Defendant Rider knew or should have known that it was unsafe to point his TASER in the "center of Chase's chest."

61.     In the May 8, 2022 Interview, after Benjamin's in-custody death, Defendant Rider states a subjective belief that Benjamin appeared to be "high" and "under the influence of some narcotic" at the time of the arrest. In the same interview, Defendant Rider stated that Benjamin turned toward him because Benjamin was "gassing out," meaning unable to further run at such high speeds, which if true, further demonstrates that Benjamin was no threat to Defendant Rider's safety.

62.     TASER safety policy manuals recommend avoiding TASER use on people suspected of being under the influence of drugs or alcohol or in a mental health crisis because they may be more susceptible to collateral problems.

63.     Defendant Rider knew or should have known that it was unsafe to deploy his TASER against Benjamin if he subjectively believed that Benjamin was "high" or "under the influence" of drugs.

64.     Defendant Rider knew or should have known that it was unsafe to deploy his TASER against Benjamin if he knew of Benjamin's mental health issues and suspected a mental health crisis was at hand.

65.     After Defendant Rider deployed his TASER, Benjamin immediately fell to the ground and rolled onto his back in a prone position, screaming when Defendant Rider continued to tase him.

66.     While Defendant Rider tased Benjamin, his TASER made an indicator clicking sound for at least five (5) seconds, even though Benjamin was in a prone position on his back in the grass and no longer standing within two (2) seconds.

67.     Defendant Rider's TASER, like other TASERs, includes technology that is supposed to record the device's usage. The TASER Report for Defendant Rider's TASER

confirms that it was deployed on May 6, 2022 at 20:09:09 hours for a duration of at least 5 seconds.

68.     Upon information and belief, Defendant Rider's TASER, like other TASERs, can be turned off after being deployed and Defendant Rider should have stopped the tasing once Benjamin was on the ground.

69.     Defendant Rider has had prior interactions with Benjamin and Plaintiff has advised Defendant Rider in past conversations about Benjamin's mental health issues.

70.     Upon information or belief, Benjamin has been a prior target of Defendant Rider.

71.     After the chase and tasing had ended, Defendant Rider can be heard on his TASER camera video excitely stating to Benjamin, "You're fuckin' gone, bro!" and laughing. Defendant Rider later repeated the same phrase, "You're fuckin' gone, bro," indicating evidence of his personal prejudice and malice toward Benjamin.

72.     When Defendant Rider spoke into his radio that he had requested Benjamin to turn around, Benjamin can be heard on the TASER camera video stating "I didn't hear you. I didn't hear you, Rider. I really didn't."

73.     Defendant Rider found no illegal items on Benjamin during a search incident to arrest, including no evidence of drug use or drug paraphenalia. The only items on Benjamin's person were a cell phone and charger.

74.     As alleged above, Defendant Rider did not advise Benjamin that he was under arrest before chasing him down and tasing him: he only did so after Benjamin was in the police car.

75.     After Benjamin had been placed in Defendant Rider's police car, Defendant Rider's in-car video records Defendant Rider asking where he hit Benjamin with the TASER

probes. Benjamin can be heard responding "Don't act like you care." In response, Defendant Rider orders Benjamin out of the car.

76.    Upon information and belief, Defendant Rider pulled Benjamin out of the car and inspected the entry points of the TASER probes on Benjamin's body. Benjamin can be heard sounding as if he is in pain and Defendant Rider states "It's gonna hurt, mofo [motherfucker], shit."

77.    Defendant Rider further falsified his police report by stating that the "Excelsior Springs EMS arrived on scene an[d] removed the taser prongs from Chase." To the contrary, at least one of the TASER prongs was still embedded in Benjamin's body when he was autopsied and was removed from his body by the medical examiner.

78.    TASER safety recommendations and law enforcement policy manuals across the country indicate that if a TASER probe hits the head, neck, chest or groin, the person hit should be monitored and examined by paramedics or other medical personnel for cardiac or other risks.

79.    Moreover, TASER safety policy manuals recommend that anyone tased who is suspected of being under the influence of drugs or alcohol should be closely monitored following the use of a TASER, regardless of the point of contact.

80.    Recent medical reports on people injured by TASERs suggest that tests or screenings may be necessary if the individual has symptoms such as a racing heart, loss of consciousness, or other signs of distress. Such tests may include an electrocardiogram.

81.    Upon information and belief, after John Doe EMS Officers arrived, Benjamin was asked if he wanted to go to the hospital. Benjamin can be heard responding affirmatively that he did want to go to the hospital, saying "if I can get water there, yeah." This is contrary to Defendant Rider's statements in the May 8, 2022 Interview, after Benjamin's death, that

Benjamin refused additional medical care. In response, a voice can be heard responding that Benjamin "can get water in jail." There was no further inquiry into Benjamin's request to go to the hospital, his health status or whether he should receive additional medical care.

82.     The Excelsior Springs Hospital is approximately 2.4 miles from The Elms Hotel and Benjamin could have been taken to the hospital for additional evaluation in a matter of minutes.

83.     Defendant Fire Department, through Defendant John Doe EMS Officers 1 and 2, failed to remove both of the TASER prongs from Benjamin's body, suggesting medical indifference or negligent failure to identify the cardiac risks Benjamin was facing from being unlawfully tased in the chest by Defendant Rider.

84.     Upon information and belief, Defendant Fire Department, through John Doe EMS Officers 1 and 2, also failed to identify any increased risks to Benjamin from tasing resulting from any drug intoxication and/or mental health crisis.

85.     Upon information and belief, John Doe EMS Officers 1 and 2 cleared Benjamin for booking at the Excelsior Springs PD without recommending further medical care.

86.     Upon information and belief, Defendants John Doe EMS Officers 1 and 2 knew or should have known of an increased cardiac risks and other health issues associated with tasing to the chest and should have taken this into account in treating Benjamin.

**ALLEGATIONS RELATING TO DETENTION AND DEATH**

87.     After Benjamin was booked at the Excelsior Springs PD, he was placed in Cell 3, where video footage begins at approximately 10:15 p.m. on May 7, 2022.

88. According to multiple accounts in police reports made and interviews taken after Benjamin's death, Benjamin was acting normally, in control of his faculties and compliant with officers at the time of booking.

89. Benjamin's condition progressively deteriorated from the time of the booking until his death in his cell over 18 hours later, causing Benjamin pain, suffering and emotional distress until his death.

90. The Cell 3 video footage shows Benjamin pacing anxiously in obvious distress and physical discomfort, especially originating in the area of his heart. The Cell 3 footage shows Benjamin repeatedly grabbing and rubbing his left shoulder, left chest and left rib cage on the evening of May 7, 2022, only a few hours after his arrest and tasing by Defendant Rider.

91. Benjamin was provided food overnight after booking and at 6:30 a.m. on May 8, 2022, after which time Defendant Rider went home for the day.

92. On May 8, 2022, Defendants Sickles, Thornton and Juarez were on duty at the Excelsior Springs PD where Benjamin was still being held in Cell 3.

93. Upon information and belief, Defendant Sickles has had past interactions with Benjamin.

94. Plaintiff has advised Defendant Sickles in past conversations about Benjamin's mental health issues.

95. According to Excelsior Springs PD reports, by approximately 1:00 p.m. on May 8, 2022, 14 hours after booking and 16 hours after arrest, Defendant Sickles reported Benjamin to be "moving erratically and sweating profusely" when he took Benjamin his lunch and at that time Defendant Sickles now believed Benjamin to be under the influence of drugs.

96.     There was no evidence to support Defendant Sickles' reported assumption that Benjamin was under the influence of drugs.

97.     At around 1:00 p.m., Defendant Sickles reports that he decided to conduct regular checks on Benjamin at 15-minute intervals, with Defendants Sickles and Thornton alternating and Defendant Juarez logging checks on the camera system when Defendants Sickles and Thornton were unavailable, but all of the officers failed to put this plan into action.

98.     At approximately 1:20 p.m. on May 8, 2022, self-serving after-the fact Excelsior Springs PD reports state that Defendant Juarez messaged Defendant Sickles regarding Benjamin's unusual behavior, at which time Defendants Sickles and Thornton went together to check on Benjamin, purportedly going as a team in reliance upon Defendant Rider's false report that Benjamin had demonstrated "violent behavior" during his arrest by Defendant Rider.

99.     According to Excelsior Springs PD reports, when Defendants Sickles and Thornton reached Cell 3, they found Benjamin "moving around erratically and sweating," "struggling to stand and remain standing," and observed him "to be very shaky and couldn't keep standing."

100.    Policy 429 of the Excelsior Springs PD Policy Manual establishes a policy that all officers be trained to provide emergency medical aid and to facilitate an emergency medical response recognizing a purpose that officers often encounter persons in need of medical aid and establishing a law enforcement response to such situations.

101.    Section 429.3 of Policy 429, titled "First Responding Member Responsibilities," requires that "[w]henever practicable, members should take appropriate steps to provide initial medical aid (e.g., first aid, CPR, use of an automated external defibrillator (AED)) in accordance with their training anc current certification levels." This Section 429.3 also requires that officers

should request response by EMS as the member deems appropriate. When requesting EMS, officers should relay certain information to EMS including: the nature of the incident, signs and symptoms, changes in apparent condition, whether the person is conscious, breathing, and alert or is believed to have consumed drugs or alcohol, and whether the person is showing signs or symptoms of excited delirium or other agitated chaotic behavior.

102.     Section 429.3 also provides that officers "should not direct EMS personnel regarding whether to transport regarding whether to transport the person for treatment."

103.     Section 429.4 of Policy 429, titled "Transporting Ill and Injured Persons" provides that, "[e]xcept in exceptional cases where alternatives are not reasonably available, [officers] should not transport persons . . . who have serious injuries, or who may be seriously ill. EMS personnel should be called to handle patient transportation."

104.     Section 429.5 of Polciy 429, titled "Persons Refusing EMS Care," provides that if an officer believes that a person in coustody requires EMS care and the person refuses, the officer "should encourage the person to receive medical treatment," including calling family members so they may encourage the arrestee to get medical treatment. If the person still refuses medical care, the officer "will require the person to be transported to the nearest medical facility."

105.     Section 429.10 of the Excelsior Springs PD Policy Manual, pertaining to Sick or Injured Arrestees, provides that "[n]othing in this section should delay an officer from requesting EMS when an arrestee reasonably appears to be exhibiting symptoms that appear to be life threatening, including breathing problems or an altered level of consciousness . . ."

106.     Upon information and belief, the Excelsior Springs PD has additional special guidelines for medical attention for injuries sustained from a use of force, cross-referenced in

Section 429.6 of its Policy Manual, which additional guidelines are contained in its Use of Force, Handcuffing and Restraints, Control Devices and Techniques, and Conducted Energy Device policies.

107. Upon information and belief, the Excelsior Springs PD has additional special guidelines for medical attention for detainees experiencing health crises regardless of use of force incident to arrest.

108. Upon information and belief, the additional guidelines in the Excelsior Springs PD Use of Force manual or additional medical guidelines would have also required additional care for Benjamin had such policies been followed by Defendants Rider, Sickles, Thornton or Juarez.

109. Further, if drug intoxication was suspected by any of the Defendants, then that is itself a serious medical condition that should have alerted medical and law enforcement personnel that additional medical monitoring was warranted for Benjamin if they believed Benjamin was in fact under the influence as Defendants Rider, Sickles, Thornton and Juarez reported to have believed.

110. Despite the compounding factors of the use of the TASER, Benjamin's deteriorating condition while in custody and their reported subjective belief that Benjamin was under the influence of drugs, Defendants Sickles, Thornton and Juarez did not monitor Benjamin every 15 minutes as planned on May 8, 2022.

111. Instead, Defendants Sickles, Thornton and Juarez reported that they checked on Benjamin only three (3) times after 1:00 p.m. until Benjamin's death by or before 4:13 p.m.: (1) Defendants Sickles, Thornton and Juarez reported that they checked on Benjamin together at approximately 1:20 p.m. as alleged above; (2) Defendant Sickles reported that he checked on

Benjamin at approximately 2:17 p.m.; and (3) Defendant Thornton reported that he checked on Benjamin at approximately 2:45 p.m. Additionally, at approximately 2:30 p.m., Defendant Sickles claims to have "heard Chase moving around from his cell" from the booking area, but Defendant Sickles did not confirm with a visual check.

112.    Upon information and belief, Cell 3 video footage shows that by 1400 hours, or 2:00 p.m., Benjamin attempts to sit up several times but is unable even to sit up on his own, falling back to the ground.

113.    Between 2:00 and 3:00 p.m., an inmate in Cell 4 heard Benjamin saying "Ouch" repeatedly, according to a May 9, 2022 investigative interview.

114.    Upon information and belief, Cell 3 video footage shows that by 1452 hours, or 2:52 p.m., Benjamin ceases moving.

115.    According to self-serving statements made in an investigative interview of Defendant Juarez after Benjamin's death, Defendant Juarez stated she went on break at approximately 1500 hours, or 3:00 p.m., and Defendant Sickles claimed to have checked on Benjamin and reported that he was "breathing."

116.    But contrary to self-serving reports and statements made after Benjamin's death by Defendants Sickles, Thornton and Juarez as alleged above, Cell 3 video footage shows no officers coming within view of the camera to check on Benjamin from at least 1:30 p.m. to 4:13 p.m., a period of nearly 3 hours before he was found dead, despite his obviously deteriorating state.

117.    At approximately 4:13 p.m., after not checking on Benjamin for nearly 3 hours, Defendants Sickles and Thornton found Benjamin non-responsive in his cell, not breathing and

with no pulse. Defendant Thornton ran to get an automated external defibrillator ("AED") device for resuscitating Benjamin.

118.     Defendant Sickles reported to have seen evidence of both rigor mortis and livor mortis, so he did not even attempt cardiopulmonary resuscitation ("CPR") while awaiting Defendant Thornton's return with the AED.

119.     Defendants Sickles and Thornton knew or should have known that performing CPR until a defibrillator is available could have saved Benjamin's life.

120.     Excelsior Springs emergency medical personnel were called and arrived on scene at approximately 4:19 p.m. and Benjamin was pronounced dead at 4:21 p.m.

**ALLEGATIONS RELATING TO THE FIRST AUTOPSY REPORT**

121.     Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

122.     In the May 8, 2022 Interview, Defendant Rider made false and self serving statements that he saw both of the TASER prongs located in Benjamin's lower torso area, below his bellybutton and above his left hip area during the May 7, 2022 Excelsior Springs EMS check incident to the arrest. Further, Defendant Rider stated that he personally observed Excelsior Springs PD remove a single TASER probe in the area of Benjamin's left hip. Both of these statements are contrary to the facts as demonstrated by the allegations above and below, as well as contradictory to statements in Defendant Rider's May 7, 2022 incident report that he aimed the TASER at Benjamin's chest and the obvious concern Defendant Rider expressed in the in-car video about where he had hit Benjamin with the TASER probes.

123.     On May 10, 2022, Defendant Forensic Medical and/or Defendant Frontier Forensics, through Dr. Alan Martinez, M.D., conducted an autopsy of Benjamin's body.

124.    On June 16, 2022, Forensic Medical issued its Autopsy Report (the "First Autopsy Report"), which included a toxicology analysis conducted by NMS Labs and reported on May 31, 2022.

125.    The First Autopsy Report identified a cutaneous defect of the lateral, left aspect of Benjamin's chest where a TASER probe was still stuck in the skin. This is one of the areas Benjamin repeatedly rubs and grabs in the Cell 3 video footage described above. This is contrary to Defendant Rider's false reports on May 7, 2022 that the TASER probes were removed at the time of the arrest and also contrary to Defendant Rider's statements in the May 8, 2022 Interview that they were located lower on the torso. The First Autopsy Report does not identify any injuries on Benjamin's lower torso or hip area.

126.    However, the First Autopsy Report identified extensive petechiae of the epicardium of the heart. Petechiae are pinpoints of bleeding. Electrical petechiae are common in death by electrocution and their location is indicative of the vital origin of the events leading to death.

127.    Upon information or belief, one or more of the investigative officers—Defendants Johnson, Traxler, Bernice, Ford or Kahler—were present at the Clay County Medical Examiner's autopsy conducted by Frontier Forensics and/or Frontier Medical, or alternatively, communicated with Frontier Forensics and/or Forensic Medical staff about Benjamin's case leading up to the autopsy.

128.    The Summary of the First Autopsy Report contains information from one or more of the investigative officers—Defendants Johnson, Traxler, Bernice, Ford or Kahler—and/or police reports from Defendant Clay County and/or Excelsior Springs PD, including false statements that Benjamin "refused to comply with the officer's commands," "charged at the

officers," and that one of the TASER probes "was reportedly attached to the decedent's clothing."

129.    Notably, the First Autopsy Report Summary also reports that Benjamin was found unresponsive "during a cell check around 1501 hours on 5/8/2022," or 3:01 p.m. This is over an hour before Defendants Sickles and Thornton report having found Benjamin non-responsive at 1613 hours, or 4:13 p.m.

130.    Critically, although the First Autopsy Report states that Benjamin was "shot with a Taser" it does not state that Benjamin was "tased" or received any electrical shock when he was shot with the TASER. This is despite the TASER report confirming that Defendant Rider's TASER was deployed for at least 5 seconds, and the reported removal of one TASER probe by John Doe EMS Officers from Benjamin's left hip area, which Defendant Rider claimed to have personally observed in the May 9, 2022 Interview. Yet, the First Autopsy Report does not reference any injury associated with the TASER probe that was removed by Excelsior Springs EMS and does not identify any external injuries in Benjamin's lower torso or hip areas.

131.    Upon information and belief, the medical examiner was unduly influenced by, and/or colluded with Clay County and/or one or more of the investigative officers—Defendants Johnson, Traxler, Bernice, Ford or Kahler—to disregard and exclude the fact that Benjamin had been tased and an electrical shock occurred, based in part on the false pretense that one of the TASER probes merely attached to Benjamin's clothing.

132.    According to TASER informational literature, when a TASER is fired, both probes must either make contact with their target, or one must strike the target and the other the ground, to complete the electrical circuit and cause a shock.

133.     According to the National Highway Traffic Safety Administration, peak blood methamphetamine concentrations occur shortly after injection, a few minutes after smoking and around three (3) hours after oral dosing. However, due to a phenomenon called postmortem redistribution ("PMR"), post-mortem blood levels for methamphetamine are known to nearly double ante-mortem (pre-death) blood levels.

134.     Benjamin was pronounced dead at 4:21 p.m. on May 8, 2022, nearly 21 hours after his arrest by Defendant Rider, with no evidence of drugs or paraphernalia on his person at the time of arrest, no ingestion of any drugs while in police custody, and after having been reported to have been fed multiple meals.

135.     Nonetheless, despite a lack of factual basis, the medical examiner declared the cause of death to be methamphetamine overdose in the First Autopsy Report, which was finalized over a month after Benjamin's death after the medical examiner's review of the toxicology report.

136.     The original First Autopsy Report identified several items taken as evidence, including the TASER probe, DNA blood card, fingerprints, clothing and subclavian blood, urine and vitreous fluid for toxicology.

137.     The First Autopsy Report omits any statement about collection, removal or retention of wet tissue samples, whether for evidentiary or other purposes.

**ALLEGATIONS RELATING TO THE SECOND AUTOPSY REPORT**

138.     Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

139.     On June 1, 2022, on behalf of Plaintiff, Dr. Jane W. Turner, MD, PhD, of Virchow Consulting Services, LLC conducted a second autopsy of the decedent's body.

140.     Dr. Turner is a forensic pathologist with over 20 years of experience, with certificates in anatomic and clinical pathology and forensic pathology by the American Board of

Pathology. She is a former professor of pathology at both Saint Louis University School of Medicine and McMaster University, a former director of regional forensic pathology services in Ontario, Canada and a former assistant medical examiner in the metropolitan St. Louis area.

141.    On May 3, 2023, Dr. Turner received additional wet tissue samples taken from the original autopsy by Forensic Medical and/or Frontier Forensics, but only after Plaintiff was forced to file a Petition for Declaratory Relief to receive such tissues from Frontier Forensics. Even so, Dr. Turner was not provided with all tissues taken by Frontier Forensics and/or Frontier Medical in the original autopsy.

142.    Based upon Dr. Turner's observations and photographs she took during the second autopsy, Defendant Forensic Medical and/or Frontier Forensics also removed certain wet tissue samples from the decedent's body during its May 10, 2022 autopsy and medical examination not provided to Plaintiff or Dr. Turner, in the form of an approximately 3-inch section of tissue from the inside of Benjamin's chest cavity near his heart in close proximity to the location where the TASER probe was removed on the exterior of Benjamin's chest. Defendant Forensic Medical and/or Frontier Forensics did not report any tissues to have been retained as evidence or held for toxicology in the First Autopsy Report.

143.    In subsequent communcations with Defendant Frontier Medical, Plaintiff's counsel was advised that no tissues were collected from the 3-inch hole missing in Benjamin's chest cavity, despite Dr. Turner's observations to the contrary, further drawing into question the legitimacy of the First Autopsy Report and suggesting collusive behavior on the part of Defendants Clay County and Frontier Forensics and/or their employees or agents.

144.    On May 16, 2023, Dr. Turner was finally able to issue her Autopsy Examination ("Second Autopsy Report"), despite the missing tissues taken by Frontier Forensics and not provided to Dr. Turner.

145.    According to the Second Autopsy Report, in reliance on Dr. Turner's observations, photographs and microscopic analysis of tissues, Benjamin was in fact tased, with evidence that both TASER probes were imbedded in his skin in the area of the front of his left chest and rear of his left arm, resulting in an an electrical circuit created by Defendant Rider's TASER.

146.    The Second Autopsy Report confirms Defendant Rider's initial statement that he fired his TASER at Benjamin's chest area, exactly the area that TASER manuals recommend avoiding to reduce cardiac risks.

147.    Dr. Turner's observations of Benjamin found a puncture wound of the lateral left chest surrounded by 4 x 6 mm chalky discoloration and larger (1.5 x 1 cm) purple contusion and a second puncture wound of the posterolateral left upper arm which has a 1–2 mm area of chalky discoloration surrounded by larger purple contusion.

148.    Based on Dr. Turner's observations and microscopic evidence, there was extensive evidence of "electrothermal injury" (electrical burning) in Benjamin's body radiating from the TASER probes in the area of the missing tissues, including, *inter alia*, petechial hemorrhages of the eyes and skin, epicardial hemorrhages and other microscopic changes of the heart and pulmonary hemorrhagic infarcts (defined as a small localized area of dead tissue resulting from failure of blood supply).

149.    Further, the Second Autopsy Report notes that scientific literature demonstrates that certain persons subject to electrocution (an injury from electrical shock) have experienced

cardiac arrhythmias of varying durations, including up to 2 months and in some cases arrhythmia so severe as to cause death 10 hours after the electrical shock.

150. Regarding the conclusion of overdose as a cause of death, the Second Autopsy Report emphasizes that the First Autopsy Report relied on subclavian blood, which is known to be subject to artificially elevated concentrations of blood compared to femoral blood, which is the "gold standard" for toxicology testing. Dr. Turner further notes that PMR (post-mortem redistribution) limits interpretation of toxicology results to qualitative assessments only (that is, only the presence or absence of a drug), making any measurement of concentration unreliable. In other words, the conclusions drawn by Defendant Clay County's medical examiner, Defendant Frontier Forensics, are unreliable at best, if not downright false and collusive as alleged above.

151. In sum, during the approximately 21 hours from his first interaction with Defendant Rider on May 7, 2022 to his death on May 8, 2022, Benjamin Chase suffered a slow and excruciating death from the cardiac trauma caused by the unnecessary and reckless use of a TASER by Defendant Rider in response to Benjamin's legal and non-violent behavior, and the negligence and failure to provide medical care that followed by numerous Defendants.

**ALLEGATIONS RELATING TO PRODUCTS LIABILITY & TASERS GENERALLY**

152. Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

153. Defendant Axon manufactured the TASER model X26P issued to Excelsior Springs PD police officers, including Defendant Rider.

154. TASER is an acronym for Thomas [A] Swift Electric Rifle, after the 1911 novel titled *Tom Swift and His Electric Rifle*.

155. TASERs were invented in the mid-1970s by Jack Cover, an electrical engineer, which designed them with the maximum electrical charge he believed to be safe.

156.    Pulling the trigger of a TASER fires two barbed darts designed to stick into clothing or flesh, each connected by a wire to the weapon. If both darts make adequate contact, an electrical circuit is completed and the TASER discharges short, rapid pulses of electric current that radiate through the tissue between the darts, causing muscle contrations intended to disable a person temporarily and safely.

157.    Modern TASERs subject their victims to a 50,000-volt shock followed by 100 microsecond pulses of 1,200 volts.

158.    In the early 1990s, Defendant Axon, formerly named TASER International, Inc., acquired the TASER trademark, patents and licenses.

159.    In or about late 1999, to boost sales to law enforcement and correctional agencies so to dominate what was then a competitive market in TASERs, Axon quadrupled the TASER's electrical output and released the Advanced TASER Model M26.

160.    The substantial increase in electrical current made the M26 TASER much more powerful, but also increased cardiac risk. Axon made false claims to its customer base that the M26's electrical current was within established safety margins and that extensive animal and human testing comparable to that require by the FDA for testing new drugs and medical devices proved that the M26 current could not affect heart rhythms. These claims were false. There were no applicable safety standards (Axon used dated, inapplicable electric fence standards), the animal testing was minimal, and there was no scientific testing on human beings.

161.    In or about 2003, Axon began selling a lighter and even more powerful TASER: the Model X26 at issue in this case. The X26 is designed to pulse about 19 times per second through a five-second cycle. The pulses result in a clicking sound. Pulling and releasing the trigger fires the darts and initiates the five-second cycle. Importantly, this cycle can be

terminated earlier by engaging the safety. The cycle can be repeated by pulling the trigger again. Cycles are prolonged when the user holds the trigger longer than five seconds. The X26 provides no warning or safety mechanism to prevent users from inadvertently holding the trigger longer than necessary during a tense field encounter. The time and duration of each cycle is recorded on a chip in the X26 called the dataport, which can be downloaded to document the time, number and duration of discharges.

162.    Although not directly relevant to this case, with the cartridge removed, pulling the trigger cycles electricity between two electrodes, which can then be pressed against a person's skin, causing a painful burning sensation. This feature is called "drive stun" mode. Drive stuns can also be applied through an expanded cartridge.

163.    To produce the equivalent disabling effect from a smaller power source, Axon increased the X26's pulse duration far beyond that of any previous TASER. This longer pulse, even though it had lower peak amperage, increased the propensity of the X26 to "capture" cardiac rhythms when current flowed near the heart, thus increasing the risk of disrupting normal heart rhythms by triggering contractions where they do not belong, thereby creating the risk of inducing an arrhythmia, particularly ventricular fibrillation, which invariably results in death unless promptly reversed with defibrillation shocks.

164.    Following the 2003 release of the X26 to law enforcement agencies, there were reports of cardiac arrests after discharges near the heart where the close proximity in time between the TASER discharge and the cardiac arrest, and lack of a credible alternative explanation for the cardiac arrest, demonstrated that the direct effect of the X26 current on the heart rhythm was the cause of the cardiac arrest.

165.     Likewise, there were reports of in-custody deaths following TASER use resulting from acute acidosis.

166.     Since the early 2000s after widespread distribution of the TASER Model X26, the number of deaths during and after tasing by police have been significant.

167.     Between 2001 and 2012, more than 500 people died from police use of TASERs.

168.     Between 2010 and 2021, an estimated 500 people died from police use of TASERs.

169.     TASERs are in a category of devices also known as electronic control devices ("ECDs"), conducted energy devices ("CEDs"), or conducted electrical weapons ("CEWs") and medical literature analyzing the effects of TASERs often use the term ECD or CED rather than the TASER trademark.

170.     Starting in the mid-2000s, shortly after release of the Model X26, a significant body of scientific literature has developed studying the physiological effects of tasing.

171.     Studies have shown that the X26 can interfere with heart rhythm even when the darts do not penetrate the skin at all, and also when using the X26 in drive stun mode on the chest over the area of the heart.

172.     Studies have also shown that CEDs can cause acidosis, which is a significant increase in blood acidity (a drop in pH) caused by a build up of carbon dioxide. Persons suffering from acute respiratory/pulmonary acidosis or acute metabolic acidosis progressively deteriorate. Without treatment, severe acidosis can be fatal.

173.     Axon has been aware since at least 2005 that standard X26 current "captured" heart rhythm when the darts were on the chest, as demonstrated by a study funded by Axon and conducted by Drs. Patrick A. Tchoe, M.D., of the Cleveland Medical Clinic, a leading

electrophysiologist, and his fellow Dhanunjaya Lakkireddy, M.D., after which study the researches met with Axon representatives and explained to them that darts near the heart can result in cardiac capture and therefore risk ventricular fibrillation.

174. Likewise, Axon has or should have been aware since at least 2006 that muscle contractions from TASER Model X26 can cause or contribute to acidosis based on a peer reviewed article by James R. Jauchem *et al*. in the journal Forensic Science International. Earlier studies had also shown a connection between acute metabolic acidosis and in-custody restraint, and Jauchem, *et al.*, concluded that medical monitoring of tasing subjects may be required since restraint often immediately follows TASER use.

175. Although a court ruled in 2012 that the link between acidosis and tasing was not "known or knowable" to Axon at the time leading up to the tasing death of Michael Rosa in August 29, 2004 by an M26 model (the older and less powerful version of the X26 used on Benjamin), numerous studies such as the Jauchem *et al*. study have since directly linked acidosis to tasing.

176. Numerous other lawsuits against Axon, some under its former name as TASER International, Inc., have alleged that tasing has caused death by cardiac arrest or acidosis, and such lawsuits have included extensive expert testimony and reference to scientific studies linking TASER use to death from these conditions.

177. Critically, even the recent 2022 User Manual for the Model X26P, which is 40 pages long, entirely lacks any reference to cardiac risks or acidosis.

178. Notably, the 2022 User Manual for the Model X26P also makes no recommendation for medical monitoring following tasing, despite frequent reccommendations

for medical monitoring in scientific articles studying TASER risks and even police training manuals across the country.

179.    This is despite warnings over a decade earlier in an October 2009 Product Warnings manual published by Axon (as TASER International, Inc.) identifying "ECD Known and Potential Side Effects" including a summary of Physiologic or Metabolic Effects as follows:

> The ECD can produce physiologic or metabolic effects which include, but are not limited to, changes in: acidosis; adrenergic states, blood pressure; calcium, creatine kinase ("CK"); electrolytes (including potassium), heart rate and rhythm; lactic acid; myoglobin; pH; respiration; stress hormones and other biochemical neuromodulators (e.g., catecholamines). Reasonable effort should be made to  In human studies of electrical discharge from a single ECD of up to 15 seconds, these effects on acidosis, CK, electrolytes, stress hormones and vital signs have been comparable to or less than changes expected from physical exertion similar to struggling, resistance, fighting, fleeing, or from the application of some other force tools or techniques. Adverse physiologic or metabolic effects may increase risk of death or serious energy.

180.    The same 2009 Product Warnings note that pre-existing physiological or metabolic conditions may increase susceptibility for an arrest-related death, including but not limited to: "a hypersympathetic state, autonomic dysregulation, capture myopathy, hyperthermia, altered electrolytes, severe acidosis, cardiac arrest, drug or alcohol effects . . ., alterations in brain function . . ., cardiac disease, pulmonary disease, sickle cell disease, and other pathologic conditions."

181.    Yet, the same 2009 Product Warnings contradictorily includes a bulletin purporting to show that "New Medical Research Disproves the Acidosis Theory of Liability Used in the Heston Case: TASER ECD Does not Cause Dangerous Levels of Acidosis."

182.    Despite periodic minor modifications to its TASER user manuals and training bulletins, Axon has routinely undermined any precautionary or deterrent effects that such manuals and bulletins may have contained by publicly and falsely denying any risks from tasing, both in literature published by Axon and in statements by its executives, consultants and

spokespeople acting in their capacity as agents of Axon. Specifically as relates to the significantly increased risks associated with tasing in the chest and other sensitive areas, Axon and its representatives have made false and misleading statements that would not serve to put end users on notice of these risks.

183.    Axon has aggressively attempted to undermine independent scientific analysis through self-serving research funded by Axon itself. In a 2017 review of Axon's research conducted by Reuters, nearly 30% of the research Axon cites as supporting TASER safety was funded in full or part by Axon, or conducted by Axon employees or consultants, some of which admit that they own stock in the company in their publications. Axon uses these biased studies to deny liability and undermine any warnings that it may include in its manuals.

184.    Upon information and belief, for many years, Axon has maintained and promulgated a training program for customer agencies and their end users but consistent with Axon's and its agents' public statements, such programs likewise minimized the risks attendant to TASER use and did not adequately emphasize the importance of aiming away from the chest and other sensitive areas.

185.    Upon information and belief, Axon has not only deliberately failed to warn of the known dangers of its TASERS and contradicted what few warnings it does provide, it has also engaged in a pattern of disinformation and intimidation. Its tactics have included, *inter alia*: providing checklists to law enforcement agencies for how they should respond to an in-custody death as a matter of standard procedure; attempting to influence active investigations into in-custody deaths following tasing; and lawsuits against coroners and medical examiners who concluded that tasing was a cause of death.

186.    In sum, the risks of cardiac arrest and acidosis associated with tasing and with the specific Model X26P TASER used on Benjamin have been known and knowable for over a decade.

187.    In disregard of these risks and with a purpose of placing profits over safety, Axon maliciously, intentionally, deliberately, wantonly, recklessly and negligently placed a defective, unreasonably dangerous product in the stream of commerce and misrepresented the medicine and science to their customers and users, defrauding them, lying to them, and misleading them concerning crucial facts that the risk of an adverse cardiac effect increases dramatically when the darts are located in the chest area or close to the heart, while at the same time giving false assurances of safety. This behavior has led to more incidents of cardiac arrest and acidosis death, including Benjamin's fatal encounter with Defendants Rider and other Excelsior Springs PD.

## COUNT I

### 42 U.S.C. § 1983:

### Violation of Fourth Amendment Prohibition Against Unlawful Search & Seizure
### (Against Defendant Rider)

188.    Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

189.    Defendant Rider's acts and/or omissions described herein were done in his individual capacity and his official capacity. He acted under color of state law and in the course and scope of his employment with Defendant Excelsior Springs PD as a police officer.

190.    Defendant Rider knew that Benjamin was not engaged in violent or criminal activity and he was called merely because Benjamin was "walking around" and "talking to people."

191.    Defendant Rider admits that he did not advise Benjamin of the basis for his arrest. There is no indication in Defendant Rider's taser video or other evidence that Defendant Rider

ever even spoke to Benjamin before running him down and tasing him when Benjamin was unarmed and behaving in a non-violent manner.

192.    Defendant Rider had a duty to advise Benjamin of the basis for his arrest under the Fourth Amendment of the United States Constitution.

193.    In failing to advise Benjamin of the basis for his arrest, Defendant Rider violated Benjamin's rights under the Fourth Amendment to the United States Constitution against unlawful search and seizure and the Fourteenth Amendment to the United States Constitution via 42 U.S.C. § 1983.

194.    Defendant Rider knew or should have known that he was violating Benjamin's statutory and constitutional rights when he ran Benjamin down, tased him and arrested him without telling him the basis for his arrest.

WHEREFORE, Plaintiff respectfully requests this Court enter Judgment against Defendant Rider for actual and compensatory damages in a sum which is fair and reasonable, for attorney fees pursuant to 42 U.S.C. § 1988, together with costs herein expended, for punitive damages against Defendant Rider in such a sum as will punish Defendant Rider, and deter him from like conduct in the future, an injunction prohibiting Defendant Rider from serving as a police officer with the Excelsior Springs PD now or in the future, and for such other and further relief as the Court deems just and proper.

## COUNT II

### 42 U.S.C. § 1983:

### Violation of Eighth Amendment Prohibition Against Cruel & Unusual Punishment

### (Against Defendant Rider)

195.    Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

196.     In addition to the Eighth Amendment's prohibition against cruel and unusual punishment, according to the United Nations Code of Conduct for Law Enforcement Officials, law enforcement officers have a duty of care to respect and protect human dignity and maintain and uphold the human rights of all persons, and a corresponding duty to avoid the use of force unless strictly necessary and only to the extent required for the performance of their duty.

197.     Defendant Rider violated these duties by using unnecessary and excesive force against Benjamin.

198.     Defendant Rider's acts and/or omissions described herein were done in his individual capacity and his official capacity. He acted under color of state law and in the course and scope of his employment with Defendant Excelsior Springs PD as a police officer.

199.     Defendant Rider had a history of interactions with Benjamin, and was aware of Benjamin's mental health issues.

200.     Defendant Rider had personal prejudice and malice against Benjamin.

201.     On May 7, 2022, Defendant Rider knew that Benjamin was unarmed when he encountered him at The Elms Hotel. Defendant Rider ran after Benjamin on foot without provocation and without telling Benjamin he was under arrest and shot his TASER at Benjamin's chest with no belief of a threat of personal harm.

202.     Defendant Rider knowingly and intentionally used his TASER on Benjamin with a purpose of harassing, punishing and inflicting pain on Benjamin.

203.     Defendant Rider knowingly and intentionally continued to tase Benjamin after Benjamin was immobilized in a prone position on the ground with a purpose of punishing and inflicting pain on Benjamin. Defendant Rider could have stopped the tasing cycle early by hitting the safety on his TASER, but chose not to.

204.    Defendant Rider laughed and gloated at the pain and suffering he caused Benjamin on his TASER video.

205.    Defendant Rider acted with deliberate indifference, gross negligence and reckless disregard to the safety, security, and constitutional and statutory rights of Benjamin, and all persons similarly situated.

206.    Defendant Rider's actions were motivated, at least in part, by racial animus.

207.    As a direct result of Defendant Rider tasing Benjamin, Benjamin suffered grievous bodily harm, pain, suffering, fear and ultimately death, in violation of his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution and the Fourteenth Amendment to the United States Constitution via 42 U.S.C. § 1983.

208.    Defendant Rider knew or should have known that he was violating Benjamin's statutory and constitutional rights when he tased Benjamin.

209.    The acts of Defendant Rider as set forth above exhibited malice, recklessness and deliberate indifference to the federally protected rights of Benjamin.

WHEREFORE, Plaintiff respectfully requests this Court enter Judgment against Defendant Rider for actual and compensatory damages in a sum which is fair and reasonable, for attorney fees pursuant to 42 U.S.C. § 1988, together with costs herein expended, for punitive damages against Defendant Rider in such a sum as will punish Defendant Rider, and deter him from like conduct in the future, an injunction prohibiting Defendant Rider from serving as a police officer with the Excelsior Springs PD now or in the future, and for such other and further relief as the Court deems just and proper.

## COUNT III

### 42 U.S.C. § 1983:

### Violation of Fourth Amendment Right to Medical Care Pre-Detention

### (Against Defendants Rider and John Doe EMS Officers)

210.    Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

211.    At all times relevant, Defendants Rider and John Doe EMS Officers acted under color of state law in the performance of their official duties and in their individual capacity.

212.    Defendant Rider knew that he had tased Benjamin in the chest at point-blank range and, upon information and belief, reported this to John Doe EMS Officers.

213.    In the May 8, 2022 Interview, in self-serving statements made after Benjamin's death, Defendant Rider reported a subjective belief that Benjamin was under the influence of drugs.

214.    Upon information and belief, Defendant Rider may have also reported this information to John Doe EMS Officers.

215.    As alleged above, Defendant Rider was familiar with Benjamin and his mental health disorders from past interactions.

216.    Defendant Rider should have known Benjamin was in a possible mental health crisis, both from the reported descriptions of his behavior at The Elms Hotel, Defendant Rider's observations, and from prior contact with Benjamin, including Plaintiff's explanation to Defendant Rider in the past of Benjamin's mental health disorders.

217.    Upon information and belief, John Doe EMS Officers were also familiar with Benjamin from past interactions.

218.     Defendants Rider and John Doe EMS Officers knew, or should have known, that Benjamin was at risk of experiencing a serious medical condition, both from the TASER shot to the chest, and from Benjamin's behavior.

219.     Defendants Rider and John Doe EMS Officers knew or should have known that any one of tasing directly to the chest, drug intoxication or mental health crises are each complicating factors associated with increased risk of TASER injury and death.

220.     Defendants Rider and John Doe EMS Officers knew, or should have known, that TASER safety recommendations are for additional medical monitoring both for any person shot in the chest and for people tased who are believed to be intoxicated or suffering from mental illness.

221.     Notwithstanding the tasing, Defendants Rider and John Doe EMS Officers knew or should have known that Benjamin was experiencing significant a medical condition, from his inability to stand on his own and other behaviors reported by police officers during and after the arrest.

222.     When Benjamin was asked whether he wanted to go to the hospital for additional care, he responded affirmatively that he did and his request was disregarded and treated with deliberate indifference, being told he could "get water in jail."

223.     According to Defendant Rider's in-car camera, the interaction with Excelsior Springs EMS lasted only a matter of minutes, which cursory interaction is an insufficient period of time for adequate medical assessment.

224.     John Doe EMS Officers unreasonably failed to refer Benjamin to a hospital, recommend additional monitoring and health assessment, or any number of other preventative actions through John Doe EMS Officers, could have taken.

225.     Defendants Rider and John Doe EMS Officers have an affirmative duty to provide adequate medical care to persons in custody.

226.     It was objectively unreasonable, reckless, and grossly negligent for Defendants Rider and John Doe EMS Officers to disregard Benjamin's request to go to the hospital and to further disregard the complicating factors indicative of additional medical care.

227.     The denial of medical care by Defendants Rider and John Doe EMS Officers violated Benjamin's right to be secure in his person, guaranteed by the Fourth Amendment of the United States Constitution, and secured and codified in 42 U.S.C. § 1983.

228.     Defendants Rider and John Doe EMS Officers knew or should have known they were violating Benjamin's statutory or constitutional rights by failing to provide medical care.

WHEREFORE, Plaintiff respectfully requests this Court enter Judgment against Defendant Rider and Excelsior Springs EMS for actual and compensatory damages in a sum which is fair and reasonable, for attorney fees pursuant to 42 U.S.C. § 1988, together with costs herein expended, for punitive damages against Defendants Rider and John Doe EMS Officers in such a sum as will punish them, and deter them from like conduct in the future, an injunction mandating Defendants Rider and John Doe EMS Officers go through additional training on diversity, equity and inclusion, mental health crises and TASER risks and post-tasing treatment, and for such other and further relief as the Court deems just and proper.

## COUNT IV

### 42 U.S.C. § 1983:

### Violation of Fourteenth Amendment Right to Medical Care Post-Detention

### (Against Defendants Rider, Sickles, Thornton and Juarez)

229.     Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

230. Defendant Rider, both individually and in his official capacity as an employee of Excelsior Springs PD, created the situation in which Benjamin was tased, giving rise to an ongoing duty of care to protect Benjamin from danger of injury from being tased, which duty extended to both Defendant Rider during and after the arrest and to Defendants Sickles, Thornton and Juarez after Benjamin had been taken into custody.

231. Defendant Rider knew, or should have known, that Benjamin was at risk of experiencing a serious medical condition, both from tasing generally, Defendant Rider's tasing of Benjamin in the chest, and from Benjamin's behavior, whether he was intoxicated, in a mental health crisis, suffering a medical emergency or otherwise.

232. Defendant Rider knew, or should have known, that TASER safety recommendations are for additional medical monitoring both for any person shot in the chest and for people who are believed to be intoxicated or suffering from mental illness.

233. Upon information and belief, Defendant Rider failed to provide any additional monitoring before his shift ended and failed to instruct his colleagues to conduct additional medical monitoring of Benjamin, and Benjamin would not have died but for inadequate monitoring.

234. Likewise, Defendants Sickles, Thornton and Juarez each purport to have had a subjective belief based on Defendant Rider's reported statements, as well as on their experience and behavior, that Benjamin was under the influence of drugs or suffering a medical emergency.

235. At least Defendant Sickles had actual knowledge of Benjamin's mental health disorders from his past interactions with Benjamin and Plaintiff.

236. Defendants Sickles, Thornton and Juarez also knew that Benjamin had been tased.

237.     Defendants Sickles, Thornton and Juarez knew or should have known that TASER safety recommendations are for additional medical monitoring both for any person shot in the chest and for people tased who are believed to be intoxicated or suffering from mental illness.

238.     Notwithstanding any tasing or any other factors, Defendants Sickles, Thornton and Juarez knew or should have known that Benjamin was experiencing a medical emergency, from his inability to stand on his own, inability to communicate and other behaviors noted in their reports.

239.     Defendants Sickles, Thornton and Juarez observed Benjamin's condition deteriorate throughout their shifts, and knew additional medical monitoring was warranted, as evidenced by their plan to monitor Benjamin every 15 minutes.

240.     Defendants Sickles, Thornton and Juarez unreasonably failed to seek any additional medical assessment for Benjamin from experienced medical personnel.

241.     Defendants Sickles, Thornton and Juarez unreasonably failed to monitor Benjamin themselves, despite their claimed intentions to do so every 15 minutes.

242.     According to self-serving statements made in interviews after Benjamin's death, Defendants Sickles reported to Defendant Juarez at one point that Benjamin was "breathing," indicating Defendant Sickles was aware that Benjamin was at risk to stop breathing and knew or should have known Benjamin was facing a serious medical condition that should require medical attention.

243.     As alleged above, Defendants Sickles, Thornton and Juarez allowed nearly 3 hours to lapse between in-person checks of Cell 3 according to video footage in the last hours of Benjamin's life.

244.     Defendant Sickles did not even attempt CPR when he found Benjamin unresponsive in his cell, although Defendant Sickles knew or should have known that CPR can save lives by keeping the heart beating until defibrillation can occur.

245.     Defendants Rider, Sickles, Thornton and Juarez acted with deliberate indifference and reckless disregard for Benjamin's medical condition, which directly caused Benjamin's pain, suffering, mental anguish and untimely death, violating Benjamin's right to due process under the Fourteenth Amendment's Due Process Clause.

246.     Defendants Rider, Sickles, Thornton and Juarez had an affirmative duty to provide adequate medical care after Benjamin was taken into custody.

247.     Defendants Rider, Sickles, Thornton and Juarez knew or should have known that they violated Benjamin's constitutional or statutory rights by failing to provide adequate medical care.

WHEREFORE, Plaintiff respectfully requests this Court enter Judgment against Defendants Rider, Sickles, Thornton and Juarez for actual and compensatory damages in a sum which is fair and reasonable, for attorney fees pursuant to 42 U.S.C. § 1988, together with costs herein expended, for punitive damages against Defendants Rider, Sickles, Thornton and Juarez in such a sum as will punish them, and deter them from like conduct in the future, an injunction mandating Defendants Rider, Sickles, Thornton and Juarez go through additional training on diversity, equity and inclusion, mental health crises and TASER risks and post-tasing treatment, and for such other and further relief as the Court deems just and proper.

## COUNT V

## 42 U.S.C. § 1983:

## Entity and Supervisory Liability

## (Against Defendants City of Excelsior Springs, Police Chief Dull and Fire Chief Maddick)

248. Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

249. At all times relevant, John Doe EMS Officers operated both in their individual capacity and in their official capacity as employees and agents of Defendant City and under the supervision of Defendant Fire Chief Maddick.

250. As alleged above, John Doe EMS Officers 1 and 2 knew or should have known that Benjamin was tased in the chest and requested to go to the hospital, and also knew or should have known that Benjamin could be suffering a mental health crisis, all of which are factors requiring additional medical care after tasing, and their failure to provide additional care indicates a failure of training.

251. Defendants City and/or Fire Chief Maddick have an affirmative duty to adequately train emergency response officers on the risks associated associated with TASER use, including the enhanced cardiac risks for shots directed at the chest, and the medical monitoring and care that should be given to people tased. Defendants City and/or Fire Chief Maddick failed in this duty, to the detriment of Benjamin and at the risk of all citizens of the State of Missouri.

252. Defendants City and Fire Chief Maddick acted with deliberate indifference, gross negligence, and reckless disregard to the safety, security and constitutional and statutory rights of Benjamin and all persons similarly situated by maintaining, enforcing, tolerating, permitting, acquiescing in and applying policies, practices and customs that disregard the serious risks of tasing and failing to adequately train EMS personnel on the additional medical monitoring and care necessary for persons tased in the head, neck, chest or groin.

253.     Additionally, at all times relevant, Defendants Rider, Juarez, Sickles and

Thornton operated both in their individual capacity and in their official capacity as employees

and agents of Defendants City and and under the supervision of Defendant Police Chief Dull.

254.     As alleged above, Benjamin had been targeted by Defendants Rider and Sickles

and/or other Excelsior Springs PD employees on multiple occasions in the past, and Defendants

Rider and Sickles had actual knowledge of Benjamin's mental health disorders.

255.     As alleged above, upon information and belief, there was a racial animus

underlying these interactions.

256.     As alleged above, Defendant Rider admitted that he pointed his TASER at the

center of Benjamin's chest, in direct contradiction of TASER safety training protocols, and also

knew or should have known that Benjamin could be suffering a mental health crisis and claimed

in after-the-fact interviews that he believed Benjamin was under the influence, which are factors

requiring additional medical care after tasing, and Defendant Rider's actiosn to the contrary

indicate a failure of training.

257.     As alleged above, Defendants Sickles, Thornton and Juarez also knew or should

have known that Benjamin could be suffering a mental health crisis and claimed in after-the-fact

interviews that they believed Benjamin was under the influence, both of which should be

considered a serious medical condition and which are factors requiring additional medical care

after tasing, and their actions to the contrary indicate a failure of training.

258.     Defendants City and/or Police Chief Dull have an affirmative duty to adequately

train police officers on the circumstances in which TASER use is appropriate, the use of

TASERs, the risks associated therewith, and the medical monitoring and care that should be

given to people tased. Defendants City and/or Police Chief Dull have failed in this duty, to the detriment of Benjamin and at the risk of all citizens of the State of Missouri.

259. Defendants City and Police Chief Dull knew or reasonably should have known that police officers use TASERS unreasonably and/or have implicit or explicit racial bias in their targeting of civilians, and have an affirmative duty to address racial animus through diversity, equity and inclusion ("DEI") training and other personnel management measures. Yet they failed to take any steps to remedy and demonstrated deliberate indifference to or tacit approval of these constitutional deprivations, directly contributing to the constitutional violations suffered by Benjamin and others similarly situated.

260. Defendants City and Police Chief Dull and Fire Chief Maddick acted with deliberate indifference, gross negligence, and reckless disregard to the safety, security and constitutional and statutory rights of Benjamin and all persons similarly situated by maintaining, enforcing, tolerating, permitting, acquiescing in and applying policies, practices and customs of, among other things:

     a. Failing to adequately train police officers on the clear and present danger required to use lethal or sub-lethal force, including TASERS, resulting in uses of force unreasonable and excessive under the circumstances;

     b. Failing to adequately train police officers on zones of the body that are particularly dangerous for TASER use, including the head, neck, chest and groin;

     c. Failing to adequately train police officers on behaviors and risk factors contra-indicative of TASER deployment, such as drug intoxication or mental illness;

     d. Failing to adequately train both police officers and EMS personnel on mental health crisis management;

e.  Failing to adequately train both police officers on the additional medical monitoring and care necessary for persons tased in the head, neck, chest or groin;

f.  Failing to adequately train, supervise, and control officers in the arts of law enforcement, including civilians who are unarmed;

g.  Failing to adequately train police officers to alert citizens to the cause and basis for arrest; and

h.  Failure to adequately train police officers in DEI.

WHEREFORE, Plaintiff respectfully requests this Court enter Judgment against Defendants City, Police Chief Dull, and Fire Chief Maddick for actual and compensatory damages in a sum which is fair and reasonable, for attorney fees pursuant to 42 U.S.C. § 1988, together with costs herein expended, and injunctive relief requiring them to establish programs or increase existing programs of DEI training, training on TASER risks, safety and use, mental health crisis training, training on post-tasing medical monitoring and care, and for such other and further relief as the Court deems just and proper.

## COUNT VI

### ASSAULT & BATTERY

### (Against Defendant Rider)

261.  Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

262.  Defendant Rider intentionally, unnecessarily and unreasonably chased Benjamin, placing Benjamin in fear of imminent threat of harm to his person, without even telling Benjamin that he was under arrest.

263. Defendant Rider then used unreasonable and excessive lethal or sub-lethal force against Benjamin by intentionally shooting Benjamin with a TASER, and intentionally aiming and shooting the TASER at Benjamin's chest in direct contradiction of TASER safety training.

264. Defendant Rider knew or should have known that Benjamin was unarmed and did not present any threat to Defendant Rider's personal safety.

265. As a direct and proximate result of the conduct of Defendant Rider, Benjamin experienced bodily injury, pain and suffering and mental anguish, and ultimately death.

266. As a direct and proximate result of Defendant Rider's intentional and tortious conduct, Plaintiff and and Benjamin sustained damages including but not limited to loss of income, consortium, companionship, comfort, and support, and Plaintiff incurred additional damages in funerary expenses for Benjamin.

WHEREFORE, Plaintiff respectfully requests this Court enter Judgment against Defendant Rider for actual and compensatory damages in a sum which is fair and reasonable, for attorney fees, together with costs herein expended, for punitive damages against Defendant Rider in such a sum as will punish Defendant Rider, and deter him from like conduct in the future, an injunction prohibiting Defendant Rider from serving as a police officer with the Excelsior Springs PD now or in the future, and for such other and further relief as the Court deems just and proper.

## COUNT VII

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against Defendant Rider)

267. Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

268.    Defendant Rider had a history of interactions with Benjamin and had actual knowledge of Benjamin's mental disorders.

269.    Defendant Rider had a personal vendetta and/or racial animus against Benjamin.

270.    As alleged above, on May 7, 2022, Benjamin was not engaged in criminal activity and was not behaving violently while at The Elms Hotel.

271.    Defendant Rider was capable of talking to Benjamin, calling for back-up sooner if he believed it was necessary to apprehend Benjamin, or otherwise avoiding confrontation.

272.    Instead, Defendant Rider created a situation that resulted in him unholstering and drawing his TASER with a clear intent and desire to use his TASER on Benjamin at the first chance he could get, whether or not Benjamin presented any danger, which he did not.

273.    Defendant Rider knowingly, intentionally and recklessly shot his TASER directly into Benjamin's chest, which Defendant Rider knew or should have known, would create an undue risk of cardiac and physical injury, pain and suffering to Benjamin.

274.    Defendant Rider knowingly and intentionally used his TASER on Benjamin with a purpose of punishing and inflicting pain on Benjamin.

275.    Defendant Rider knowingly and intentionally continued to tase Benjamin after Benjamin was immobilized in a prone position on the ground with a purpose of punishing and inflicting pain on Benjamin.

276.    Benjamin suffered emotional distress, physical harm, and ultimately death as a result of Defendant Rider's actions.

277.    As a direct and proximate result of Defendant Rider's intentional and tortious conduct, Plaintiff and Benjamin sustained damages including but not limited to loss of income, consortium, companionship, comfort, and support, and Plaintiff incurred additional damages in

cremation expenses for Benjamin which could not be paid. Additionally, Plaintiff has been unable to afford a memorial service and anticipates incurring additional expenses for such costs.

278.     Defendant Rider's actions were willful, wanton or malicious, constituted gross misconduct and demonstrated a conscious and reckless disregard for the rights of Benjamin and Plaintiff, thereby allowing an award of punitive damages.

WHEREFORE, Plaintiff respectfully requests this Court enter Judgment against Defendant Rider for actual and compensatory damages in a sum which is fair and reasonable, for attorney fees, together with costs herein expended, for punitive damages against Defendant Rider in such a sum as will punish Defendant Rider, and deter him from like conduct in the future, an injunction prohibiting Defendant Rider from serving as a police officer with the Excelsior Springs PD now or in the future, and for such other and further relief as the Court deems just and proper.

## COUNT VIII

### NEGLIGENCE

### Improper Use of TASER

### (Against Defendant Rider)

279.     Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

280.     Defendant Rider holds himself out as possessing the necessary degree of skill and learning required to provide law enforcement and emergency responder services.

281.     Defendant Rider had a duty to act in a manner consistent with the applicable standard of care for law enforcement officers.

282.     As alleged above, according to the United Nations Code of Conduct for Law Enforcement Officials, law enforcement officers have a duty of care to respect and protect

human dignity and maintain and uphold the human rights of all persons, and a corresponding duty to avoid the use of force unless strictly necessary and only to the extent required for the performance of their duty.

283.    As alleged above, Defendant Rider reported that he pointed his TASER directly at Benjamin's chest and fired.

284.    It was reckless and directly contrary to TASER safety and training protocols for Defendant Rider to aim directly at Benjamin's chest.

285.    Defendant Rider knew that Benjamin was unarmed and walking the grounds at The Elms Hotel.

286.    Defendant Rider knew that Benjamin was not engaged in any criminal or violent behavior while at The Elms Hotel.

287.    Defendant Rider knew, or should have known, that Benjamin had a potentially serious medical condition, whether from a mental health crisis or otherwise.

288.    Defendant Rider was trained in TASER handling and safety.

289.    Defendant Rider knew, or should have known, that shooting Benjamin in his chest posed an increased cardiac risk.

290.    Defendant Rider's use of the TASER was a reckless and excessive use of force against an unarmed, autistic Black man, who was acting non-violently and had not committed any crime.

291.    Defendant Rider's use of the TASER violated the applicable standards of care and was the direct and proximate cause of Benjamin's death by cardiac injury.

292.    Benjamin would not have died but for Defendant Rider's use of the TASER.

293. As a direct and proximate result of Defendant Rider's tortious conduct, Plaintiff and Benjamin sustained damages including but not limited to loss of income, consortium, companionship, comfort, and support, and Plaintiff incurred additional damages in funerary expenses for Benjamin.

WHEREFORE, Plaintiff respectfully requests this Court enter Judgment against Defendant Rider for actual and compensatory damages in a sum which is fair and reasonable, for attorney fees, together with costs herein expended, for punitive damages against Defendant Rider in such a sum as will punish Defendant Rider, and deter him from like conduct in the future, an injunction prohibiting Defendant Rider from serving as a police officer with the Excelsior Springs PD now or in the future, and for such other and further relief as the Court deems just and proper.

## COUNT IX

### NEGLIGENCE

### Failure to Provide Medical Care After Use of TASER

### (Against Defendants Rider and John Doe EMS Officers)

294. Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

295. Plaintiff especially incorporates as if fully stated herein each allegation under Count II, which allege in detail Defendant Rider's and John Doe EMS Officers's knowledge of the risks associated with inadequate medical care after a person is shot by a TASER, especially if the victim is under the influence of drugs or in a mental health crisis, and knowledge of the additional medical monitoring and treatment warranted for such persons.

296. Defendants Rider and John Doe EMS Officers each were acting in their individual and official capacity at all times relevant.

297.     Defendant Rider is an officer of the peace with a duty to protect the citizens of the State of Missouri from harm. Defendant Rider has a duty to protect arrestees from harm while in his custody.

298.     Additionally, Defendant Rider created the situation in which Benjamin was tased, giving rise to an ongoing duty of care to protect Benjamin from danger of injury from being tased.

299.     Defendant Excelsior Springs EMS is an emergency medical service engaged in providing medical and public health services to the public and holds itself out as expert and knowledgeable in such care.

300.     Defendant John Doe EMS Officers are medical technicians with a duty to inform themselves of the risks attendant to TASER use and mental health issues.

301.     Defendants Rider and John Doe EMS Officers each breached their duty of care by failing to provide adequate medical assessment and care to Benjamin after he was tased and while he was experiencing a serious medical condition.

302.     Benjamin would not have died but for the negligence of Defendants Rider and John Doe EMS Officers.

303.     As a direct and proximate result of Defendant Rider's and John Doe EMS Officers' tortious conduct, Plaintiff and Benjamin sustained damages including but not limited to loss of income, consortium, companionship, comfort, and support, and Plaintiff incurred additional damages in funerary expenses for Benjamin.

WHEREFORE, Plaintiff respectfully requests this Court enter Judgment against Defendant Excelsior Springs EMS for actual and compensatory damages in a sum which is fair and reasonable, for attorney fees, together with costs herein expended, for punitive damages in

such a sum as will punish and deter like conduct in the future, and for such other and further relief as the Court deems just and proper.

## COUNT X

### NEGLIGENCE

### Failure to Provide Medical Care In Custody

### (Against Defendants Rider, Sickles, Thornton and Juarez)

304.     Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

305.     Defendant Rider created the situation in which Benjamin was tased, giving rise to an ongoing duty of care to protect Benjamin from danger of injury from being tased.

306.     Defendant Rider knew, or should have known, that Benjamin was at risk of experiencing a serious medical condition, both from tasing generally, Defendant Rider's tasing of Benjamin in the chest, and from Benjamin's behavior.

307.     Defendant Rider knew, or should have known, that TASER safety recommendations are for additional medical monitoring both for any person shot in the chest and for people who are believed to be intoxicated or suffering from mental illness.

308.     Defendant Rider failed to instruct his colleagues to conduct additional medical monitoring of Benjamin, and Benjamin would not have died but for inadequate monitoring.

309.     Likewise, Defendants Sickles, Thornton and Juarez reported to have subjectively believed that Benjamin was allegedly under the influence of drugs.

310.     Defendants Sickles, Thornton and Juarez also knew that Benjamin had been tased.

311.     Defendants Sickles, Thornton and Juarez knew, or should have known, that TASER safety recommendations are for additional medical monitoring both for any person shot in the chest and for people who are believed to be intoxicated or suffering from mental illness.

312.    Notwithstanding the tasing or any other factors, Defendants Sickles, Thornton and Juarez knew or should have known that Benjamin was experiencing significant a medical condition, from his inability to stand on his own, communicate and other behaviors noted in their reports.

313.    Defendants Sickles, Thornton and Juarez observed Benjamin's condition deteriorate throughout their shifts, and knew additional medical monitoring was warranted, as evidenced by their plan to monitor Benjamin every 15 minutes.

314.    Defendants Sickles, Thornton and Juarez unreasonably failed to seek any additional medical assessment for Benjamin from experienced medical personnel.

315.    Defendants Sickles, Thornton and Juarez unreasonably failed to monitor Benjamin themselves, despite their intentions to do so every 15 minutes.

316.    According to statements made in interviews after Benjamin's death, Defendant Sickles reported to Defendant Juarez at one point that Benjamin was "breathing." Rather than adequate monitoring, this statement indicates concern that Benjamin was doing poorly enough that he could stop breathing and Defendants Sickles, Thornton and Juarez knew or should have known Benjamin was facing a serious medical condition that should require medical attention.

317.    Defendant Sickles did not even attempt CPR when he found Benjamin unresponsive in his cell.

318.    Defendants Sickles, Thornton and Juarez violated Excelsior Springs PD Policy Manual Policy 429.

319.    Upon information and belief, Defendants Sicles, Thornton and Juarez violated additional Excelsior Springs PD Policy Manual policies in the Use of Force manual and/or other policies related to detainee health.

320.     Defendants Sickles, Thornton and Juarez acted with deliberate indifference and reckless disregard for Benjamin's medical condition.

321.     Benjamin suffered a prolonged and agonizing death as a result of the Defendants' tortious conduct.

322.     Benjamin would not have died but for the negligence, willfulness and deliberate indifference and reckless disregard of Defendants Rider, Sickles, Thornton and Juarez in failing to provide adequate medical care and/or request additional medical service.

323.     As a direct and proximate result of Defendant Rider's and John Doe EMS Officers' tortious conduct, Plaintiff and Benjamin sustained damages including but not limited to loss of income, consortium, companionship, comfort, and support, and Plaintiff incurred additional damages in funerary expenses for Benjamin

WHEREFORE, Plaintiff respectfully requests this Court enter Judgment against Defendants Rider, Sickles, Thornton and Juarez for actual and compensatory damages in a sum which is fair and reasonable, for attorney fees, together with costs herein expended, for punitive damages against said Defendants in such a sum as will punish said Defendants, and deter them from like conduct in the future, and for such other and further relief as the Court deems just and proper.

## COUNT XI

## *RESPONDEAT SUPERIOR*, OR ALTERNATIVELY, CONTRIBUTORY NEGLIGENCE

### Failure to Adequately Train on Use of TASER

### (Against Defendants City and Police Chief Dull)

324.     Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

325.     Defendant Police Chief Dull is the supervisor of Defendant Rider.

326. Defendant Police Chief Dull is the Chief of Police with responsibility for ensuring his staff are adequately trained.

327. Upon information and belief, Defendants City maintains a policy of insurance in which its police officers are named insureds and that covers claims for bodily injury against public officials and employees for an occurrence caused by the negligent acts alleged in this Complaint.

328. Excelsior Springs Police Department, amanaged by Polcie Chief Dull, is the agency responsible for protecting human dignity and maintaining and upholding the human rights of all persons within their jurisdiction.

329. Defendant City and Police Chief Dull each has a duty to adequately train all police officer employees.

330. Defendant City and Police Chief Dull each has a heightened duty to adequately train all police officer employees on the use of deadly or potentially deadly force, including the use of TASERs, including educating officers on the potential cardiac risks and other risks inherent in TASER use.

331. Defendants City and Police Chief Dull each has an affirmative duty to adequately train police officers on the circumstances in which TASER use is appropriate, the use of TASERs, the risks associated therewith, and the medical monitoring and care that should be given to people tased.

332. Defendants City and Police Chief Dull breached these duties, to the detriment of Benjamin and at the risk of all citizens of the State of Missouri.

333. Benjamin was a young black man with mental health issues and had been targeted by Defendant Rider and other Excelsior Springs PD employees on multiple occasions in the past.

334.     Upon information and belief, there was a racial animus underlying these interactions, which Defendants City and/or Police Chief Dull should have addressed through DEI training for its officers.

335.     Defendant City and Police Chief Dull each has a heightened duty to adequately train all police officer employees to not racially profile or to violate citizens rights based on the color of their skin.

336.     Defendant Rider pointed and shot his TASER directly at Benjamin's chest, in violation of well-known TASER safety guidance, while in the performance of his duty as an employee and agent of Defendant City and under the supervision of Defendant Police Chief Dull.

337.     Defendant City and Police Chief Dull failed to train Defendant Rider to avoid shooting his TASER where there was no threat to himself, and further failed to train Defendant Rider not to aim his TASER at the chest.

338.     Defendant City and Police Chief Dull each has a duty to adequately screen its police officer employees for appropriate temperament for public service.

339.     Defendant City and Police Chief Dull knew or should have known that Defendant Rider did not have an adequate temperament for active duty and/or knew or should have known that Defendant Rider had a personal vendetta against Benjamin.

340.     Defendants City and/or Police Chief Dull are liable for Benjamin's wrongful death under the doctrine of *respondeat superior*.

341.     Alternatively, Defendants City, Excelsior Springs PD and Police Chief Dull were contributorily negligent in failing to properly train Defendant Rider in the use of his TASER and risks associated therewith.

WHEREFORE, Plaintiff respectfully requests this Court enter Judgment against Defendants City and Police Chief Dull for actual and compensatory damages in a sum which is fair and reasonable, for attorney fees, together with costs herein expended, for an injunction requiring Defendants to provide increased training programs as detailed in the Prayer for Relief, *infra*, and for such other and further relief as the Court deems just and proper.

## COUNT XII

### *RESPONDEAT SUPERIOR*, OR ALTERNATIVELY, CONTRIBUTORY NEGLIGENCE

### Failure to Provide Medical Care After Use of TASER

### (Against Defendants City, Police Chief Dull, and Fire Chief Maddick)

342.    Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

343.    Defendant City is the employer of Defendants Rider, Sickles, Thornton, and Juarez.

344.    Defendant Police Chief Dull is the Chief of Police with responsibility for ensuring his staff are adequately trained.

345.    Defendant City is the employer of John Doe EMS Officers 1 and 2.

346.    Defendant Fire Chief Maddick is the Fire Chief with responsibility for ensuring his staff are adequately trained.

347.    Upon information and belief, Defendants City maintains a policy of insurance in which its police officers and emergency medical personnel are named insureds and which insurance policy covers claims for bodily injury against public officials and employees for an occurrence caused by the negligent acts alleged in this Complaint.

348.    Defendants City, Police Chief Dull, and Fire Chief Maddick each has a duty to adequately train all emergency response employees (including police and EMS) in the medical

care that should be provided after an arrest, and this duty is heightened with near-lethal force involved in use of a TASER.

349. Defendants City, Police Chief Dull, and Fire Chief Maddick each has a duty to adequately train all emergency response employees (including police and EMS) in the medical care that should be provided for persons exhibiting signs of experiencing a serious medical condition, including tasing, mental health crises and drug intoxication.

350. Defendants Rider and John Doe EMS 1 and 2 all failed to provide adequate medical assessment and care to Benjamin while employees of Defendants City and in the performance of their duties and under the supervision of Police Chief Dull and Fire Chief Maddick, respectively.

351. Defendants Rider, Sickles, Thornton and Juarez all failed to provide adequate medical monitoring and care to Benjamin while employees of Defendant City and in the performance of their duties and under the supervision of Police Chief Dull.

352. These failures are indicative of inadequate training.

353. Defendants City, Police Chief Dull, and Fire Chief Maddick are liable for Benjamin's wrongful death under the doctrine of *respondeat superior* for the actions and/or omissions of Defendants Rider, Sickles, Thornton and Juarez and the John Doe EMS Officers while in the performance of their duties as employees.

354. Alternatively, Defendants City, Police Chief Dull, and Fire Chief Maddick were contributorily negligent in failing to properly train Defendants Rider, Sickles, Thornton and Juarez and John Doe EMS Officers in the circumstances in which additional medical monitoring and care are necessary, including and especially for individuals shot with a TASER in the chest and/or shot with a TASER while under the influence of drugs or in a mental health crisis.

WHEREFORE, Plaintiff respectfully requests this Court enter Judgment against Defendants City, Police Chief Dull, and Fire Chief Maddick for actual and compensatory damages in a sum which is fair and reasonable, for attorney fees, together with costs herein expended, for an injunction requiring Defendants to provide enhanced training on medical care as detailed in the Prayer for Relief, *infra*, and for such other and further relief as the Court deems just and proper.

## COUNT XIII

### FRAUD & CIVIL CONSPIRACY &

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (Against Defendants City, Police Chief Dull, Clay County, Clay County Sheriff Akin, Sergeant Johnson, Detectives Traxler, Pernice, Ford & Kahler, Frontier Forensics and/or Forensic Medical)

355.    Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

356.    As public agencies imbued with the public trust, Defendants Clay County, Excelsior Springs PD and Frontier Forensics and/or Forensic Medical have an affirmative and fiduciary duty to be truthful and accurate in their reporting and investigation of deaths and wrongdoing of police officers.

357.    Upon information and belief, Defendant Clay County sent one or more of Defendants Sergeant Johnson and Detectives Traxler, Pernice, Ford and Kahler to attend the autopsy of Benjamin and/or said Defendants consulted with Forensic Medical and/or Frontier Forensics at the time of the autopsy, and such Defendants knowingly and purposefully provided information to Defendants Frontier Forensics and/or Forensic Medical known to be false,

misrepresentative or misleading about the facts surrounding Benjamin's tasing, deteriorating physical condition while in police custody by the Excelsior Springs PD, and death.

358.    Upon information and belief, Defendants Frontier Forensics and/or Forensic Medical knowingly and purposefully omitted key information from the Autopsy Report that would show Benjamin's death was caused by being tased directly in the chest, including, but not limited to, failure to identify the location of the TASER probe allegedly removed by Excelsior Springs EMS and failure to reference removal of wet tissue samples from Benjamin's chest area as evidence that was collected.

359.    Upon information and belief, Defendants Clay County and/or Defendants Sergeant Johnson and Detectives Traxler, Pernice, Ford and Kahler, together with Frontier Forensics and/or Forensic Medical, colluded in a conspiracy to hide TASER shooting as a primary or contributing cause of Benjamin's death to avoid liability for Benjamin's death.

360.    The omissions and representations by each of these Defendants has caused Plaintiff to suffer severe emotional distress caused by erosion of trust in public servants and the injustice to her son, Benjamin.

361.    The omissions and representations by each of these Defendants jeopardizes Plaintiff's legitimate claims for Benjamin's wrongful death on behalf of herself and his family.

362.    Defendant Clay County chose Frontier Forensics and/or Frontier Medical to be its medical examiner in or about 2018 as a cost-saving mechanism.

363.    Frontier Forensics and Forensic Medical have a history of reversing or revising the conclusions of their own medical examinations and the types of acts and omissions alleged in this Count and in the Allegations Relating to the First Autopsy Report have likely occurred before and hurt other families.

WHEREFORE, Plaintiff respectfully requests this Court enter Judgment against Defendants Clay County, Sergeant Johnson, Detectives Traxler, Pernice, Ford and Kahler, Excelsior Springs PD and Frontier Forensics and/or Forensic Medical for actual and compensatory damages in a sum which is fair and reasonable, for attorney fees, together with costs herein expended, for punitive damages against said Defendants in such a sum as will punish said Defendants and deter them from like conduct in the future, an injunction requiring Defendant City to re-evaluate its selection of medical examiner, and for such other and further relief as the Court deems just and proper.

**COUNT XIV**

**STRICT PRODUCTS LIABILITY FAILURE TO WARN**

**Mo. Rev. Stat. § 536.760(3)(b)**

**(Against Defendant Axon)**

364.    Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

365.    Defendant Axon designed, manufactured, transferred, sold, distributed, installed, fabricated, assembled, bought, inspected, tested, serviced, marketed, warranted, instructed and advertised the TASER Model X26, which was unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and Benjamin and Plaintiff have been damaged as a direct result of the product being sold without adequate warnings.

366.    As alleged above, Defendant Rider used the X26 in a manner reasonably anticipated, and Benjamin was injured and died as a direct and proximate result of the product being sold without an adequate warning.

367.    As a proximate result, Plaintiff was damaged by the loss of her son as alleged above.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment against Defendant Axon for actual and compensatory damages in a sum which is fair and reasonable, for attorney fees, together with costs herein expended, for punitive damages against Defendant Axon in such a sum as will punish defendant, and deter it from like conduct in the future, and for such other and further relief as the Court deems just and proper.

## COUNT XV

## NEGLIGENCE

### (Against Defendant Axon)

368.    Plaintiff incorporates as if fully stated herein each of the foregoing allegations.

369.    Defendant Axon designed, manufactured, transferred, sold, distributed, installed, fabricated, assembled, bought, inspected, tested, serviced, marketed, warranted, instructed and advertised the TASER Model X26.

370.    Defendant Axon knew or in the exercise of reasonable care should have known that the X26 would be used by Defendant Axon's customers without inspection for defects or dangers in their parts, mechaisms or design, or without conducting independent research into their safety.

371.    Defendant Axon knew or should have known that its TASERs are capable of causing, and have in fact cuased, personal injuries including cardiac arrest, acidosis and death to persons while being used in a manner reasonabley foreseeable, thereby rendering the product unsafe and dangerous for its intended use.

372.    As alleged above, Defendant Rider used the X26 in a manner reasonably anticipated, and Benjamin was injured and died as a direct and proximate result of the product being sold without an adequate warning.

373.     In addition, as alleged above Defendant Axon has actively implemented a training program for customer agencies and end users, upon which such end users rely, and which imposes on Axon a heightened duty of care to update its training protocols.

374.     Defendant Axon breached its duty of care by failing to update its training protocol and materials to instruct users to avoid shots to the chest because of the increased risk of cardiac arrest for several years after such risks were known, and further breached its duty of care by issuing contradictory statements which undermined warnings that were later provided.

375.     Defendant Axon further breached its duty of care by failing to update its training protocol and materials to instruct users to avoid post-tasing restraint and provide for additional medical monitoring to avoid deaths from acidosis as well as cardiac arrest, and Defendant Axon has still not issued any warnings to this effect.

376.     Had Defendant Axon timely and reasonably provided adequate instructions and training concerning safe and effective use of the X26, law enforcement professionals, including Defendant Rider, would have more safely deployed the X26, and provided additional medical monitoring post-tasing, which Defendants Rider, Sickles, Thornton and Juarez failed to provide.

377.     As a proximate result of Defendant Axon's negligence, Benjamin suffered and died and Plaintiff has been damaged by the loss of her son.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment against Defendant Axon for actual and compensatory damages in a sum which is fair and reasonable, for attorney fees, together with costs herein expended, for punitive damages against Defendant Axon in such a sum as will punish Defendant, and deter it from like conduct in the future, and for such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

378.     To summarize the requests for relief identified with each individual count alleged above, Plaintiff seeks in this action:

379.     Compensatory Damages as against all Defendants (including all governmental and individual Defendants): in an amount not less than $10 million for the loss of the value of Benjamin's life.[1]

380.     Attorneys Fees and Costs: as calculated by the lodestar method for attorney rates in the Kansas City legal market with expertise necessary and adequate to pursue similar claims.

381.     Punitive Damages for Federal Law Claims: as against the individual Defendants Rider, Juarez, Sickles and Thornton, John Doe EMS Officers 1 and 2, in the amount proportionate and reasonably related to the harm suffered by Benjamin and Plaintiff, in an amount up to nine (9) times the cumulative damages sought, or no less than $90,000,000.

382.     Punitive Damages for State Law Claims: as against the individual Defendants Rider, Juarez, Sickles and Thornton, John Doe EMS Officers 1 and 2, and Defendants Sergeant Johnson and Detectives Traxler, Pernice, Ford and Kahler, in the amount of the greater of $500,000 or five (5) times the amount of the cumulative judgment against all Defendants, per R.S.Mo. § 510.265, or no less than $50,000,000.

383.     Injunctive and Declaratory Relief in the form of an Order against the governmental Defendants, Police Chief Dull and Fire Chief Maddick, as outlined below:

         a.     all Excelsior Springs PD employees must immediately desist in all TASER use unless and until an enhanced training program is established for TASER use;

---

[1] According to actuaries and U.S. agencies, the value of a human life is approximately $10 million. *See, e.g.*, https://www.npr.org/transcripts/835571843 (last visited Feb. 26, 2023).

b.      Excelsior Springs PD must review and revise its existing training policies for TASER use and establish an enhanced training program for TASER use, with special emphasis on the clear and present danger that is required before using both lethal and less-lethal force, the signs and symptoms that place citizens at greater risk from TASER injury (including mental health crises and drug intoxication), the cardiac risks from TASERs, the areas of the body that should never be targeted, and the additional medical monitoring and care that should be administered to people who are tased;

c.      Fire Department must review and revise its existing training policies for medical treatment after TASER use and establish an enhanced training program, with special emphasis on the signs and symptoms that place citizens at greater risk from TASER injury (including mental health crises and drug intoxication), the cardiac risks from TASERs, the areas of the body that place taser victims at increased risk of medical injury, and the additional medical monitoring and care that should be administered to people who are tased;

d.      Excelsior Springs PD must rigorously enforce said TASER training program;

e.      Excelsior Springs PD must also establish an enhanced diversity, equity and inclusion (DEI) training program for its officers;

f.      Said TASER training and DEI training programs must provide for third-party audits, review and oversight by an appropriate, accredited outside organization, and must include citizen participation;

g.      All Excelsior Springs PD policies, manuals, and training protocols must be

made publicly-available and downloadable on the internet to allow for better

transparency and better citizen participation in community policing;

h.      City must re-evaluate its selection of Frontier Forensics and/or Forensic

Medical as its medical examiner, with consideration of competitiors and

reputation, quality of work and other factors independent of cost;

i.      and for such other and further relief as the Court deems just and proper.

384.    Plaintiff respectfully submits that the above requested relief is fully within the

powers of this Court and will do much to prevent the tragedy suffered by Benjamin, Plaintiff and

her family from falling upon yet another American citizen and help restore the community's trust

in community policing.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable by law.

Respectfully submitted,

THE BATES & MERRYMAN LAW FIRM LLC

*/s/ Matthew T. Merryman*

Matthew T. Merryman, MO Bar No. 66078
Nicholas Bates, MO Bar No. 67179
P.O. Box 10282
Kansas City, MO 64171
Phone: 816-223-4482 (Merryman)
      816-490-6627 (Bates)
Email: mmerryman@bmmb.com
      nbates@bmmb.com

THE MERRYMAN GUTHRIE LAW FIRM LLC

Rachel D. Guthrie, MO Bar No. 64881
4100 Terrace St.
Kansas City, MO 64111
Phone: 816-608-2760
Email: rguthrie@merrymanguthrielaw.com

ATTORNEYS FOR PLAINTIFF DIANNA
CHASE